IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DCCI, LLC, and ROBERT GONZALEZ,

                Plaintiffs,

        v.

MIKE KEITH,

                Defendant.

_____

Case No. 6:13-cv-00883-MC

OPINION AND ORDER

MCSHANE, Judge:

       Plaintiffs Robert Gonzalez and his company DCCI, LLC (collectively "Gonzalez"), bring claims for fraud, rescission of contract based on fraud, and breach of contract arising out of plaintiffs' purchase of a 1970 Dodge Challenger from defendant Mike Keith. In short, Gonzalez alleges Keith's misrepresentations induced him to purchase the Challenger. Keith moves for summary judgment. For the reasons stated below, Keith's motion, ECF No. 42, is GRANTED.

## BACKGROUND

       This case arises out of an oral contract, whereby Gonzalez agreed to purchase Keith's 1970 Dodge Challenger automobile for $200,000. (Gonzalez Decl. ¶ 6.) Gonzalez, an experienced purchaser of collector cars, (Dazer Decl., Ex. 5), contacted Keith in February 2013 out of interest in purchasing the Challenger. After hearing Keith's description of the Challenger, namely, that the car was in excellent shape with nothing wrong with it, was in its original factory

1 – OPINION AND ORDER

condition except for repainting, had 33,000 miles on it, and was driveable, Gonzalez wired Keith $50,000 to hold the Challenger. [1] (Gonzalez Decl. ¶¶ 3, 5, 6.) After further correspondence, Gonzalez wired Keith an additional $50,000 to continue to hold the Challenger. (Gonzalez Decl. ¶ 8.)

On March 13, 2013, Gonzalez hired renowned expert Galen Govier to inspect the Challenger in Mansfield, Ohio. (Gonzalez Decl. ¶ 9.) Govier spent over four hours examining the Challenger, taking notes and hundreds of photographs. (Maxine Keith Decl. ¶¶ 3-4.) However, the thoroughness of Govier's evaluation was limited because he did not have the car lifted. Despite obtaining only a partial inspection, after hearing Govier's report that the Challenger was in fine to excellent condition, Gonzalez felt confident enough to have the Challenger transported to Roseburg, Oregon. (Govier Decl. ¶ 3; Gonzalez Decl. ¶ 11.) During the transportation process, the Challenger would not start. (Gonzalez Decl. ¶ 11.)

Once in Roseburg, the Challenger still would not start and Gonzalez observed a number of problems that were inconsistent with Keith's representations. (Gonzalez Decl. ¶ 12.) Gonzalez proceeded to perform work on the Challenger, repairing the starting system. (Gonzalez Decl. ¶ 13.) On May 8, 2013, Gonzalez hired Govier to perform a second inspection of the Challenger in a location where the car could be lifted for a complete inspection. (Govier Decl. ¶ 5.) After discovering many additional defects and serious mechanical issues, Govier reappraised the car at $62,000. (Govier Decl. ¶¶ 5-6.)

When Keith learned that Gonzalez was performing work on the Challenger despite having only paid half of the purchase price, Keith sent Gonzalez an email on May 20, 2013,

---

[1]Dean Herron performed an initial inspection of the Challenger for Gonzalez. There is some dispute as to whether Herron can be considered a Chrysler automobile expert, (Dazer Decl., Ex. 1), but it is not material to the my conclusion here and I assume Herron is not an expert.

advising him to not start, work, or drive the Challenger until the remaining balance of $100,000 was paid. (Keith Decl., Ex. 2.) Alternatively, Keith offered to pick up the car and transfer the $100,000 Gonzalez had paid back to his account. (Keith Decl., Ex. 2.) In response, Gonzalez sent Keith a letter stating that he had incurred damages in reliance on Keith's misrepresentations and would rescind the contract and release the vehicle on the condition that the sum of $131,506.22 be paid to Gonzalez. (Dazer Decl., Ex. 4.) $131,506.22 includes the $100,000 down payment plus $31,506.22 in transportation costs, inspection costs, parts and labor for the repairs Gonzalez made to the Challenger, and insurance costs. The letter gave Keith five days to accept the offer. (Dazer Decl., Ex. 4.)

On May 28, 2013, Gonzalez filed this action asking the court to rescind the contract as a result of Keith's fraudulent misrepresentations regarding the Challenger. Gonzalez seeks return of the $100,000 earnest money (plus interest) and $31,506.22 in damages. Keith now moves for summary judgment.

## STANDARD OF REVIEW

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id*. The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Comartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party

must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

**1.  Rescission Based on Fraud and Reliance Damages Based on Fraud**

 To make out a prima facie case of fraud, a plaintiff must show by clear and convincing evidence that "the defendant made a material misrepresentation that was false; the defendant did so knowing that the representation was false; the defendant intended the plaintiff to rely on the misrepresentation; the plaintiff justifiably relied on the misrepresentation; and the plaintiff was damaged as a result of that reliance." *Strawn v. Farmers Ins. Co. of Or.*, 350 Or. 336, 352 (2011).

The fraud element at issue here is whether Gonzalez "justifiably relied on the misrepresentation." "Justifiable reliance requires a 'right to rely,' which is acquired by taking reasonable precautions to safeguard one's own interests." *Gregory v. Novak,* 121 Or. App. 651, 655 (1993). Oregon courts have consistently held that there is a duty on the part of the purchaser to use some measure of protection and precaution to safeguard his interest. *Johnson et ux. v. Cofer*, 204 Or. 142, 149-50 (1955); *Miller v. Protrka*, 193 Or. 585, 598 (1951); *Hansen v. Holmberg*, 176 Or. 173, 184 (1945); *Baker v. Casey*, 166 Or. 433, 437 (1941); *Coy v. Starling*, 53 Or. App. 76, 80 (1981). For example, the Oregon Supreme Court has noted that:

> It is, of course, well settled that a purchaser must use reasonable care for his own protection, and should not rely blindly upon statements made by a seller, and that, between parties dealing at arms' length, where no fiduciary relationship exists and no device or artifice is used to prevent an investigation, it is the general rule that a purchaser must make use of his means of knowledge, and, failing to do so, he cannot recover on the ground that he was misled by the seller.

*Baker*, 166 Or. at 437; *see Miller*, 193 Or. at 598.

4 – OPINION AND ORDER

Therefore, although "justifiable reliance" may serve to protect inexperienced buyers not engaged in an arm's length transaction, it does not protect buyers with experience in the particular transaction at issue when they fail to investigate despite being given the opportunity to do so—such inaction may result in the loss of the right to rely on the seller's representations. *Coy*, 53 Or. App. at 81. For example, in *Coy*, the purchasers of a motel, who had experience in the purchasing and operating of income properties, as well as in bookkeeping, lost their right to rely on the sellers' representations after declining the sellers' offer to examine the motel's books and records. *Id*. at 78-79. The court held that the buyers failed to use reasonable care for their own protection when they were offered an opportunity to inspect the books, which would have illuminated the specific point they brought suit over. *Id*. at 78, 81. Therefore, the sellers were not liable to the purchasers for alleged fraud in their representations. *See id*. at 82.

Similarly, in *Miller*, the buyers of a motel sought to have the contract rescinded based on allegations of false and fraudulent representations related to the motel's profits. 193 Or. at 591. The court found that the buyers, when inspecting the motel, had the opportunity to examine the record of its vacancies and profits. Therefore, the buyers could not blindly rely on the seller's statements regarding vacancy, but were required to make use of their means of knowledge.[2] *Id*. at 598. The court held the buyers could not rescind the contract because they: were experienced operators of a rental apartment; inspected the motel and were not refused an opportunity to

---

[2]The court held that "dealer's talk," including, "there was hardly ever a vacancy," is considered "puffing" and does not reach the level of fraudulent representation when the parties deal at arm's length; rather, such dealer's talk is regarded as a mere expression of opinion upon which a purchaser cannot safely rely, especially when "the prospective buyers have or can obtain equal means of information and are equally qualified to judge certain factors claimed to contribute to the value of the property offered for sale. To such statements the maxim of caveat emptor applies." *Id*. at 596-97.

5 – OPINION AND ORDER

personally inspect the books which were on the premises during their inspection; had a second opinion through legal counsel as to the quality of the deal; and were dealing at arm's length with the seller. *Id*. at 602.

To acquire a right to rely on Keith's representations, which is necessary to sustain his claims based on fraud, Gonzalez must have taken reasonable precautions and investigatory action to safeguard his own interests with regard to the purchase of the Challenger. In viewing the facts in the light most favorable to Gonzalez, there is no dispute that the contract in this case involved an arm's length transaction in which the buyer, Gonzalez, was an experienced purchaser of collector cars. (Dazer Decl., Ex. 5 (listing the eleven collector cars Gonzalez purchased prior to the transaction with Keith)). Furthermore, Gonzalez inspected the Challenger on two ocassions in order to ascertain for himself its quality, condition, and value before agreeing to have it shipped to Oregon. Galen Govier, literally the world's foremost expert in appraising the specific year, make, and model of the vehicle at issue, performed the second inspection. Gonzalez flew Govier from out of state to perform the inspection. Govier spent over four hours inspecting the Challenger, taking hundreds of photographs. (Maxine Keith Decl. ¶¶ 3-4.) At no point prior to litigation did Govier or Gonzalez ever inform Keith that Govier's half-day inspection was in any way inadequate. Additionally, none of the facts indicate that Keith either inhibited inspection of the Challenger, or would have refused to allow it to be hoisted had Gonzalez so desired.

Based on these undisputed facts, no reasonable juror could find that Gonzalez took reasonable precautions to protect his interests. One would presume that the average car buyer, let alone an experienced buyer of collector cars with the business acumen of Gonzalez, would insist that a complete inspection be performed before finalizing the purchase of a $200,000 vehicle.

6 – OPINION AND ORDER

Further, prior to transporting the Challenger from Ohio, Gonzalez was aware that the Challenger would not start, putting him on notice that Keith's representation that the Challenger was in excellent condition with nothing wrong was inaccurate. (Gonzalez Decl. ¶ 11.) Nonetheless, Gonzalez had the Challenger transported over 2,500 miles from Mansfield, Ohio to Roseburg, Oregon.

Once Gonzalez had the Challenger in his possession, he proceeded to treat the car as his own property by performing work on it that altered its original condition. (Dazer Decl., Ex. 1.) Gonzalez waited approximately four weeks after receiving the car before having Govier perform a third inspection. (*See* Gonzalez Decl. ¶¶ 12, 15.) No reasonable jury would find Gonzalez's actions consistent with the actions of a buyer who, upon receipt of the purchased item, discovered that the product was not as the seller represented and desired to return the item, or in this case, to rescind the deal.[3]

Gonzalez relies on two cases to support his argument that a jury question exists as to whether a party who investigates may nonetheless be entitled to rely on misrepresentations made by a seller. However, both of the cases Gonzalez cites involve evidence that the seller made a material misrepresentation that he knew to be false with the intent to deceive the buyer. For example, in *Hansen v. Holmberg*, the seller of a tavern told buyers that they could purchase fourteen to sixteen kegs of beer each week from the current supplier. 176 Or. 173, 177 (1945). Furthermore, a representative of the supplier verified the seller's representation to the buyers. *Id.*

---

[3] An aggrieved party's failure to act promptly after discovery of fraud may result in an unintentional waiver of the right to rescind. For example, delay in demanding rescission, especially while maintaining possession of the benefits received, is evidence of the aggrieved party's intent to affirm the contract. *Davenport v. Vlach*, 81 Or. App. 553, 556 (1986). Furthermore, remaining in possession of the property and dealing with it as one's own, is evidence of a party's intention to affirm. Thus, Gonzalez's undisputed actions are more consistent with a desire to affirm the contract, making rescission an improper remedy.

7 – OPINION AND ORDER

The buyers put on evidence that the seller made intentional false statements for the purpose of inducing them to enter into the transaction. For example, a witness stated that the seller said, "I got a chance to unload the place and make some money, and I think I will unload it because I think I am running out of beer." *Id.* at 178. Further evidence was presented that the seller knew that his beer supply would be cut off prior to the transaction. *Id.*

Keith's representations are distinguishable from the seller's action in *Hansen* because Keith clarified that his representations were his own opinions based on what he understood about the car when he bought it from the previous owner. (Dazer Decl., Ex. 1.) Further, Keith supported Gonzalez's decision to have the car inspected by his own expert and reiterated that he wanted Gonzalez "to be certain about the car." (Dazer Decl., Ex. 1.) It was Gonzalez's expert, Galen Govier, who concluded that the Challenger was in "fine to excellent" condition and made Gonzalez feel confident enough to proceed with the deal. (Govier Decl. ¶ 3.) As noted, no one informed Keith that Govier's inspection was anything other than a complete inspection. Most importantly, the inspection of the tavern premises performed by buyers in *Hansen* was not made for the purpose of learning about the future supply of beer, which was the reason for the lawsuit. *Id.* at 183. By contrast, the inspection by Gonzalez's renowned expert was made for the specific purpose of ascertaining the quality and condition of the Challenger, which is the issue in this case.

The *Melgreen* case is similarly distinguishable because there was substantial evidence that the seller fraudulently represented the value of the chinchillas despite knowing their true worthless value in order to deceive the buyers so they would accept the deal he had drawn up. *Melgreen v. Frank L. McGuire, Inc.*, 214 Or. 128, 136 (1958). For example, the buyers alleged that seller told them that the chinchillas had been graded at eighty-five percent or better and

8 – OPINION AND ORDER

provided them with certificates of the grade, but those certificates turned out to be simple registration certificates, not proof of grading. *Id.* at 133. After the seller had given them the certificates, the buyers signed the contract. *Id.* at 134. The buyers never inspected the chinchillas at issue to determine their value, relying instead upon the seller's representations. Moreover, the parties had a fiduciary relationship because the seller was the real estate agent employed by plaintiffs. *Id.* at 136-37

      Here, Gonzalez and Keith were in an arm's length relationship. Gonzalez was an experienced purchaser of collector cars. Furthermore, Keith provided the Challenger for a complete inspection performed by a world-renowned expert of Gonzalez's choosing. Keith welcomed the inspection because he wanted to be sure Gonzalez was certain about the Challenger prior to purchasing it. (Dazer Decl., Ex. 1.) Despite the car failing to start, Gonzalez never requested a more complete inspection prior to purchasing the car and transporting it half way across the country.

      In sum, Gonzalez argues that he relied on false representations made by Keith concerning the condition of the Challenger in going forward with the transaction, and that "[i]t was not until DCCI had hired an expert to perform a *complete inspection* that [he] was able to detect the serious problems with the Challenger."(Gonzalez Decl. ¶¶ 17-18) (emphasis added). But Oregon law demonstrates that a buyer's right to rely on representations made by a seller is acquired only after the buyer takes reasonable precautions and investigatory action to safeguard his own interests. Based on the facts presented, no reasonable juror could conclude that Gonzalez took reasonable precautions in investigating the condition of the Challenger, despite having both the wherewithal and the opportunity to do so. Thus, I conclude that Gonzalez has forfeited his right to rely, and was not justified in relying on Keith's representations of the Challenger. *U.S. Nat.*

9 – OPINION AND ORDER

*Bank of Or. v. Fought*, 291 Or. 201, 222 (1981) (in Oregon, the right to rely is a question of law);

*Womer v. Melody Woods Home Corp.*, 165 Or. App. 554, 560 (2000); *Simpson v. Simpson*, 83

Or. App. 86, 88 n.1 (1986). As a result, Gonzalez fails to meet an essential element of a fraud

claim. Therefore, Keith's motion for summary judgment on Gonzalez's claims based on fraud is

GRANTED.

**2. Breach of Contract**

A breach of contract is a failure, without legal excuse, to perform any promise that forms

all or part of the contract. In this case, neither party disputes the existence of an oral contract for

the sale of the Challenger for $200,000, on the condition that the car passed inspection. (Keith

Dep. at 63:2-3, attached as Ex. 4 to Montgomery Decl.; Gonzalez Decl. ¶ 6.) Gonzalez argues

that under ORS 72.6080(1) he may revoke his acceptance of the Challenger because its

nonconformity with Keith's representations substantially impairs its value and his acceptance

was reasonably induced by the difficulty of discovery of the defects before acceptance and/or by

Keith's assurances of the quality and condition of the Challenger.

Gonzalez's ORS 72.6080(1) argument fails. ORS 72.6080(1) reads: "(1) The buyer may

revoke acceptance of a lot or commercial unit whose nonconformity substantially impairs its

value to the buyer if the buyer has accepted it: . . . (b) *Without discovery of such nonconformity* if

the acceptance was reasonably induced either by the difficulty of discovery before acceptance or

by the sellers assurances." (emphasis added). Gonzalez cannot claim to have accepted the

Challenger "without discovery of such nonconformity" when he admits that he knew the

Challenger wouldn't start when it was being loaded for transport in Ohio. (Gonzalez Decl. ¶ 11.)

Such a fact directly contradicts Keith's representation that the Challenger was drivable. Thus,

Gonzalez cannot proceed under ORS 72.6080(1).

However, even applying ORS 72.6080(1) to a different alleged defect with the Challenger, Gonzalez's claim still fails. First, Gonzalez's acceptance of the Challenger was not reasonably induced by *the difficulty of discovery* of the defects before acceptance. As thoroughly discussed above, a reasonable person would have had the Challenger hoisted so that a complete inspection could be performed and, at that point in time, would have discovered the problems Gonzalez now complains of. The evidence indicates Keith would have welcomed such a request.[4] Moreover, it was not difficult to discover that the Challenger didn't run properly—it wouldn't start when it was being loaded for transport.

Second, Gonzalez's acceptance was not *reasonably induced by Keith's assurances* of the quality and condition of the Challenger. Again, as thoroughly discussed above, the law does not protect buyers from "seller's statements" or "puffery," but instead places a duty on buyers to investigate and take precautions to protect their interests. A buyer with Gonzalez's level of experience dealing with collector cars, in an arm's length transaction, must operate according to the maxim of caveat emptor, which places the duty on Gonzalez to investigate the condition of the Challenger. Moreover, if Gonzalez was uncomfortable with the conclusions of the two experts[5] he paid to inspect the vehicle, nothing prevented him from having a complete inspection performed or simply walking away from the deal.

Third, after accepting the purchased goods, a buyer must notify the seller within a reasonable time after the buyer discovers the breach (or should have discovered the breach), or

---

[4]As noted, Keith welcomed Govier's inspection, which Keith had every right to believe was a complete inspection. Additionally, upon learning, months later, of Gonzalez's disappointment with the Challenger, Keith immediately offered to pick up the car at Gonzalez's home and reimburse all of Gonzalez's money. (Keith Decl., Ex. 2.)

[5]If Gonzalez has a valid claim against anyone, it is more likely against his renowned expert, Galen Govier, who reported that the Challenger was in fine to excellent condition after performing the inspection in Ohio on March 13, 2013.

11 – OPINION AND ORDER

be barred from a remedy. ORS 72.6070(3)(a). Based on the facts presented, Gonzalez did not notify Keith of his dissatisfaction with the Challenger within a reasonable time and is hence barred from relief. Gonzalez even admits that his notification was delayed: "the delay in notifying Defendant of Plaintiffs' revocation of acceptance was reasonable in light of these facts." (Pls.' Sur-response, at 4.) The facts Gonzalez refers to are Keith's false representations and the difficulty in discovering the defects. However, waiting approximately four weeks after learning that the Challenger would not start before ordering a complete inspection is not reasonable, let alone waiting two full months after the last incomplete inspection was performed before ordering the first complete inspection. Further, performing work that alters the condition of the vehicle one intends to return is also not reasonable or consistent with a desire to revoke.

Finally, Gonzales cites to *Lanners v. Whitney*, arguing that it is proper for this court to hold that he may revoke acceptance of the Challenger. However, in *Lanners*, one of the express conditions of the contract was that the seller deliver an airworthy aircraft that had undergone, at the seller's expense, a "100-hour inspection" prescribed by the FAA for all aircraft to ensure its airworthiness, and to replace all defective parts revealed by the inspection. *Lanners*, 247 Or. 223, 226 (1967). The seller's mechanic did not complete the 100-hour inspection, *id*. at 230, yet the seller represented to the buyer that the 100-hour inspection had been completed and the aircraft was airworthy. *Id*. at 228. After encountering serious difficulties with the aircraft, the buyer promptly notified the seller and had his own inspection performed. However, prior to the buyer's own inspection, the buyer had no knowledge of the nonconformity of the aircraft to the contract and no way to discover that nonconformity. *Id*. at 228-29, 234-35. The Court found for the buyers, allowing them to rescind the contract because the airworthiness of the aircraft was a condition of the contract. *Id*. at 236. Additionally, the Court found that the less than three week

12 – OPINION AND ORDER

period when the un-airworthy condition of the aircraft became known from the buyer's expert's inspection and the date buyer notified seller of his intent to rescind, was not unreasonable. *Id*. at 235.

Unlike *Lanners*, the inspections performed on the Challenger were not performed by the seller as a condition of the contract, but rather were performed by the buyer's own expert. Moreover, unlike the buyer in *Lanners*, Gonzalez did have knowledge of the Challenger's non-conformity with Keith's representations before taking possession of the Challenger. The contract at issue was premised on the Challenger passing Gonzalez's inspection, which it undoubtedly did. Thus, the facts of *Lanners* are not analogous to this case, and as a result, the court's conclusion in *Lanners* is inapplicable.

For the foregoing reasons, summary judgment dismissing Gonzalez's breach of contract claim is GRANTED.

## CONCLUSION

Defendant's motion for summary judgment (ECF No. 42) is GRANTED.

IT IS SO ORDERED.

DATED this 26th day of March, 2013.


_____s/ Michael J. McShane_____
Michael McShane
United States District Judge


13 – OPINION AND ORDER